## In re WHITEWATER LUMBER CO.

(District Court, M. D. Alabama, N. D. at Montgomery. April 7, 1925.)

No. 5130.

**1. Bankruptcy ⊚═140(2) — Conduct of bankrupt held equivalent to actual fraud, entitling sellers to reclaim their goods.**

Where bankrupt, at time goods were bought, was hopelessly insolvent and unable to pay for same, and such fact was known to its manager, but concealed from seller, it could not be said that bankrupt had reasonable expectation of paying for them, and hence its conduct was the legal equivalent of actual fraud, entitling seller to reclaim goods.

**2. Bankruptcy ⊚═140(2)—Knowledge of inability to pay when purchase made is constructively fraudulent.**

Knowledge of inability to pay when purchase is made is equivalent to purchase with intent not to pay, and such purchase is constructively fraudulent.

In Bankruptcy. In the matter of the Whitewater Lumber Company, bankrupt. Proceeding by the Naftel Dry Goods Company and another to review an order of the referee disallowing their claims for the return of goods sold the bankrupt. Order of referee set aside, and claims allowed.

Sternfeld & Lobman, of Montgomery, Ala., for claimants.

Rushton, Crenshaw & Rushton, of Montgomery, Ala., for bankrupt.

CLAYTON, District Judge. The Whitewater Lumber Company, hereinafter called the bankrupt, on October 17, 1924, filed its verified voluntary petition of bankruptcy by Cruikshank, its authorized president, and in due time thereafter was adjudged a bankrupt. The petition and the testimony showed that the liabilities of the bankrupt greatly exceeded its assets, and that it was undoubtedly insolvent at the time of the filing of the petition and for many months prior thereto.

The claimant Naftel Dry Goods Company, on October 6 and 8, 1924, sold the goods here sought to be reclaimed by it, $377.88 being the value of same, and the goods were received by the bankrupt one or two days thereafter. The major portion of such goods were on hand when the receiver took charge of the bankrupt estate. They were not paid for. Faulk Bros. sold a carload of hay to the bankrupt September 24, and another on October 11, 1924, of the total value of $348.65. The delivery occurred September 27 and October 14, 1924. A large part of the hay came into the possession of the receiver,

and payment for same has not been made. By consent of the parties the two claims are consolidated and considered.

The testimony, hereinafter more fully referred to, establishes that at the time the goods and hay were purchased the bankrupt was insolvent. For instance, Carter, who controlled the bankrupt, as hereinafter shown, in June or July, 1924, wrote a letter to Winter-Loeb Grocery Company, a creditor, suggesting that the bankrupt was insolvent and should be put into bankruptcy. This letter was exhibited to Cruikshank, president of the bankrupt, some time in July, 1924. It was established that in 1918 or 1919, when the reorganization of the bankrupt took place, it owed nothing to Carter or to any one else; that thereafter it steadily increased its indebtedness to Carter, and lost money until it owed Carter in May, 1921, over $100,000, and on the day of filing the petition in bankruptcy about $175,000, besides large sums to other creditors; that the plan of taking transfers of wage claims to Carter began some three years prior to October 17, 1924, which were credited with shipments to Carter Lumber Company, Carter's concern at Kansas City, Mo., in order to keep these transfers within the statute of limitations; that these transfers now amount to $43,000, and that such transfers on March 1, 1924, amounted to approximately $35,000. This item does not appear on the financial statement made on that date to Dun's Agency. Before such statement was made to Dun's Agency, it was submitted to Carter, and he approved it.

Neither J. L. Cruikshank, the president of the bankrupt, nor his brother, C. A. Cruikshank, was at the time this petition was filed, nor for several months prior thereto, the owner of any stock in the bankrupt concern. Carter owned all the stock and directed its affairs. On October 15 or 16, 1924, he transferred one share of such stock to J. L. Cruikshank's wife, in order that he and she could hold a directors' meeting to authorize the petition in bankruptcy; they constituting the board. The bankrupt, the Whitewater Lumber Company, continued to exist, more as a name than otherwise, under which Carter was carrying on his plan or operations. He took over all the shipments of lumber, applied and disbursed all moneys of the bankrupt, so that the bankrupt had no power or discretion as to whom its products should be sold, or at what price. The financial statements each year, the trial balances each month, monthly cost reports, showing

costs of the lumber from the timber in the woods to the sawed product on board the railroad cars, daily reports of operations, and requirement sheets of each month, showing pay roll, etc., were made by the bankrupt to Carter.

On June 28, 1924, by Carter's direction, the stock and minute books of the lumber company were sent to him at Kansas City, Mo., where he resided. During the latter part of June, 1924, Carter wrote a letter to the Winter-Loeb Grocery Company, stating in substance that there were only two courses left for such grocery company, a large creditor of the bankrupt, and for him to pursue —one to work out a creditors' agreement on the part of all the larger creditors, and all others who might come in voluntarily, providing for the appointment of three trustees to act, and to change the management of the bankrupt, or put the concern into bankruptcy, let its property be sold, and him and the Winter-Loeb Grocery Company buy it in at a cheap price. Cruikshank knew the contents of this letter, and did not disclose it to either of the claimants, before or at the time they made the sales of the merchandise. The letters and correspondence offered in evidence show that Carter directed and controlled the affairs of the bankrupt until the latter part of July or August, 1924, when he assumed immediate charge of the business by putting one Mills in custody thereof, fixing his salary, defining his duties, and requiring him to report to him (Carter). During the course of his control Carter reduced the salary of Cruikshank.

Pertaining to the conduct of Carter, and the condition of the bankrupt, is a letter from him to Cruikshank, July 14, 1924, in which he says: "I decided that for the present you would look after it [the store]. I also told him [Mills] what I said I would [do] about the office force, and that must be left for him to determine after he has been there long enough to be able to do so." Again he wrote Cruikshank, July 24, 1924, that "you did not understand correctly, if you understood you were to have charge of the office. The office is to be in charge of Mr. Mills, as is everything else, except the finances, and, if the store is operated to his satisfaction, it will be in your charge," etc.

Again, July 28, he wrote Cruikshank that "Mr. Mills writes me he expects to be in Autaugaville a week from to-day, ready to take charge. I hope by that time to have heard from you as to whether or not the arrangement I suggested with regard to your keep-

ing charge of the store is satisfactory. Of course, this will not preclude your doing any work in the office that seems best in Mr. Mills' judgment, and which you can do in addition to the store and financial matters. I assume you will want to do anything you can, and that you may be of considerable assistance; but you must understand the only defined duties are those proposed, but that the store must be run to advantage." "I want to caution you that you are not to expect copies of letters Mr. Mills writes me, or I write him, except where either is desirous of your having same, and that you must be very careful to allow no action of yours, either in sympathy with some employé who cannot work for Mr. Mills or in any other manner, to affect his standing or your relations with the organization. Mr. Mills is to be supreme, and I am merely giving you friendly warning."

August 11, 1924, Carter wrote the following letter to Mills: "Yours of the 7th received. I am afraid the Bowman matter is not exactly understood. I told Mr. Cruikshank that Bowman would have to go; he seemed so despairing over it, and pleaded so hard, that I finally said I would suspend my decision until you had reached there, and if you asked me to change my decision I would do so. You have not asked me to change it, and now that you say that Mr. Bowman has reminded you that he was elected by the board of directors, and could not be discharged until January 1st, I have decided any one who takes such a technical position to hold a position, the duplicate of which he should be able to obtain elsewhere, should not be retained any longer, and my decision now is he must go, since you have not interceded in his behalf, and he must go at once. I am sending Mr. Cruikshank a copy of this letter, and he must carry this out, or I shall be obliged to take other action than I had planned taking and would prefer to avoid."

August 11, 1924, Carter sent the following letter to Cruikshank: "Replying to yours of the 7th, I shall take up with Mr. Mills the question of paying the cutters weekly, and as to groceries, meat, and lard you must find some way to get them on ordinary terms. If you are not going to do anything, but get them on a cash basis, I don't see where you are going to help the company much."

For many months prior to the petition in bankruptcy the bankrupt owed $150,000 past-due notes to unsecured creditors, and Carter and Cruikshank knew such fact. They knew that these notes could not be re-

newed. It is manifest from the evidence that the claimants knew nothing about the financial embarrassment or insolvency of the bankrupt when they made their sales. They did not know that Carter was taking assignments to the wage claims as a charge or lien against the assets of the bankrupt. They did not know that the bankrupt had defaulted upon its notes, aggregating, as stated above, $150,000. They did not know that Carter was the owner of all the capital stock of the bankrupt. It must be noted that he did not take the natural course for securing his claims by mortgage upon the realty or other assets of the bankrupt, and so for the evident reason that this would have destroyed the credit of the bankrupt. He had the power to enforce, and he adopted the more secret plan of keeping the bankrupt, the Whitewater Company, an insolvent concern, alive, in order to effect a reduction of the indebtedness claimed by him against it. All the products of the bankrupt were received and disposed of by Carter.

From time to time Carter advanced money to the bankrupt, to enable it to pay wages of the employees and to purchase groceries and goods for the commissary that it was operating, until finally, before the sale of the goods involved, Carter directed Cruikshank to purchase groceries, etc., on the credit of the bankrupt, as he would not furnish any more money for that purpose.

It is a reasonable inference that claimants relied on the financial statement of March 1, 1924, and the false appearance of solvency, which statement omitted to show the liability of the bankrupt to Carter for wages which had been credited as a prior lien against the assets of the bankrupt. The insolvency of the bankrupt was concealed from the claimants, and under the circumstances it cannot be said that the bankrupt or Cruikshank, its purchasing agent and its president, had any reasonable expectation of paying for the goods at the time they were purchased from claimants, for Cruikshank or the bankrupt had no way of paying, except through Carter, and Carter had refused to furnish further money for the payment of goods.

[1, 2] My conclusion is that, at the time the goods and hay here sought to be reclaimed were sold the bankrupt, it was hopelessly insolvent and unable to pay for the same. I repeat, such fact was known at the time to the management of the bankrupt, and it was carefully concealed from the claimants. Moreover, as shown, the management of the bankrupt, who purchased the goods, knew at the time that Carter would not furnish the money to pay for them, as he had been doing from time to time. In the situation thus presented, it cannot be said that the bankrupt had the reasonable expectation of paying for the merchandise at the times of the purchases. Good faith could not have rested on ignorance of the condition of the bankrupt, for there was no ignorance of its insolvent and helpless condition. The bankrupt and its management were careless, willful, and reckless in the failure to face the real facts of the bankrupt's true condition, and knowingly and willfully concealed the same from the claimants at the time of the sales of the goods. Such conduct is a legal equivalent of actual fraud, and entitles the seller to reclaim his goods. Knowledge of inability to pay when the purchase was made is equivalent to purchase with intent not to pay, and such purchase is constructively fraudulent. Collier on Bankty. 1925 Ed. L. 1719, and authorities cited in footnote 362, in which is included Jones v. Hobbie Grocery Co. (C. C. A. 5th Cir.) 246 F. 431, 158 C. C. A. 495; In re Collins (D. C.) 242 F. 975, 39 Am. Bankr. Rep. 510. In this case the equivalent of actual fraud was established, and therefore the vendors of the goods sought to be reclaimed are now entitled to have the same restored to them. Matter of Seigel Co., 223 F. 369, 35 Am. Bankr. Rep. 128; Matter of Gurvitz (D. C.) 276 F. 931, 47 Am. Bankr. Rep. 311.

It follows that I am unable to assent to the conclusion reached by the learned referee. Decree will be entered, setting aside the order of the referee, and directing the trustee to deliver the goods and hay to the claimants, the Naftel Dry Goods Company and Faulk Bros.